Good morning, Your Honors. Good morning. May it please the Court. Are we ready? Yes. Okay, thank you. May it please the Court, Your Honor. My name is Brady Hall, and I represent five employees of the Idaho Department of Corrections who are, frankly, alarmed and bothered with how the District Court, without any reference to them in the record, branded them as having acted with deliberate indifference. My colleague, Dylan Eaton, represents Dr. Elison and Corizon, the medical providers, and we've agreed to split the time equally to 10 minutes. I'd like to reserve 13 minutes for my reply, which will force me to leave the stand here at 13 minutes, counting down. Let's just be clear. You have 10 minutes, and your colleague has 10 minutes. And so how much do you want to reserve for rebuttal? Three minutes. Three minutes, all right. Yeah, and the clock will read 13 when I need to go. My clients, like Rona and Jeff, Your Honor, they're real people. They're compassionate people. They're not corporations. They're not the Department of Corrections. They're hardworking civil servants, and they have very complex and stressful jobs. They are prison officials, but they are not medical doctors. They do not have medical training. Deliberate indifference is a very serious label to attach to anyone. It's very personal. It has very personal consequences for someone, and that's why under Farmer, the standard is very high. It requires something that is tantamount to criminal recklessness. Accordingly, in the court below, to meet her burden, Ms. Sedmo had to establish an extremely high burden, and that was that the law and facts clearly favored her position, her position that my clients, my five individual clients, acted with that reckless mental state. So looking at the record, what evidence was there that clearly established that my clients deserved that notorious brand? There was none. Ms. Sedmo did not present any evidence as to any of my five clients at the hearing. There was no evidence that any of them had the requisite subjective knowledge, and as required by Estelle, because they're nonmedical providers, nonmedical individuals, that they acted in any way that actually denied, delayed, or interfered with prescribed treatment. Absent the evidence in the record, the court's order, it had no alternative. But what it did here was overlook the absence of record and lump my clients into a category of defendants, even though the district court's order made zero factual findings as to my clients. In fact, if we read the entire order, you can't find my clients' names in there at any point. And tellingly absent from Ms. Sedmo's 14,000-word brief is any reference to my clients. Additionally, Your Honor, the district court's finding that my clients somehow acted pursuant to a de facto policy or personal bias against providing medically necessary gender-confirming surgery was equally illogical and clear-air. The court's order, what it had stated actually was not a clear finding or not even a clear showing. It just stated that the evidence merely suggested that there was some bias, that there was some de facto policy. That certainly does not rise to any high-level standard that was required here. Additionally, there was zero evidence that my clients were ever personally involved in this decision to provide an assessment or in the decision that Ms. Sedmo did not meet any medically necessary criteria. There is no evidence that my clients, my five individual clients, were ever even in a position to apply some de facto policy or bias, even if there was one. But let's look at the record. The record does not support even a suggestion that there was a de facto policy or bias. What is undisputed on the record is that Idaho Department of Corrections has long had an express policy that expressly provides that gender-confirming surgery will be provided if it's deemed medically necessary. This is the same policy, the same policy that Ms. Sedmo received a diagnosis in 2012 for gender dysphoria. It's the same policy that Ms. Sedmo promptly after her diagnosis received hormone replacement therapy. It's the same policy that for the last seven years Ms. Sedmo has been closely followed and monitored by a multidisciplinary team of providers and staff to meet her needs as evidence. Let me ask you, I take your point about each defendant as an individual defendant. If hypothetically the court were to uphold the injunction, but have questions about the applicability to certain individuals, is it your view that that issue should be remanded to the district court or that that should be decided on appeal? Your Honor, I believe it needs to be decided on appeal that the evidence is wholly lacking and it was clear error to find that my clients, my five individual clients, acted with any subject of reckless disregard. And the matter can be remanded back if it's affirmed as to Corison or any other defendants. But as to my clients, I think up here now on appeal there's zero evidence to support a finding of reckless disregard. Your Honor, regarding that policy, it's very clear from the record that there is no blanket prohibition. The testimony provided by Dr. Campbell, the chief psychologist for IDOC, was that there is no blanket prohibition. Dr. Elison, the only psychiatrist who testified in this case and who provided an individualized assessment to Ms. Sedmo in 2016, he testified that he was confident that if he recommended medically necessary gender-confirming surgery for an inmate that the IDOC corrections would provide that. Ultimately, Your Honor, there's no evidence to support any inference against my clients that they were deliberately indifferent. The facts show that Dr. Elison, a well-respected and competent psychiatrist who was compassionate to Ms. Sedmo, that he provided an individualized assessment. It's also known that my clients were aware or should have been aware that Ms. Sedmo's clinicians and chief psychologists, that they all agreed that Ms. Sedmo did not meet the criteria. They universally agreed, and they were concerned that by providing surgery, given her uncontrolled mental health issues and the fact that Ms. Sedmo would not cooperate in her treatment, they were trying to get her to go to treatment, trying to go to therapy that would address and help alleviate the gender dysphoria. But she never cooperated in that. She wouldn't do it. She repeatedly refused it. Do you want to reserve your time? I would, unless the Court has a question. No, thank you. Okay, thank you. May it please the Court, Dylan Eaton and I represent the Corizon defendants in this case, including Dr. Elison who provided the assessment of Ms. Sedmo for gender confirmation surgery in April of 2016. With the Court's permission, I will also try to reserve three minutes for my time. Although this brings me to summarize the matters I'd like to address before the Court today. First, Dr. Elison was not deliberately indifferent because he individually assessed Ms. Sedmo for gender confirmation surgery. He staffed it with multiple providers, one of whom was a clinician who was a WPATH member, and he ultimately determined that she needed to stay on hormone therapy and continue counseling at that time. She had not been cooperating with the counseling recommended by her treatment providers, and even the District Court found this troubling. Second, Corizon had no policy or procedure precluding gender confirmation surgery. Corizon and its providers followed the Idaho Department of Corrections standard, which was written, and allowed gender confirmation surgery if it was medically necessary. And third, the Court also tagged two of my clients, Dr. Winery and Dr. Leong, with the label of possible deliberate indifference, even though there were no specific findings as to these doctors. This is indicative of the Court's overbroad ruling, and findings against these individuals should be reversed. Now, I'd like to turn to Dr. Elison's care and treatment. Under the objective test of deliberate indifference, Ms. Edmo has to show that the course of treatment chosen was medically unacceptable. The District Court hangs its hat on a finding that Dr. Elison misapplied or did not use the WPATH guidelines. But Ms. Edmo has to clearly show that no other reasonable psychiatrist would have provided the assessment and care that Dr. Elison provided. This is the Estelle case, this is the Toguchi case. Yet Ms. Edmo does not have a psychiatrist, does not have a psychiatrist expert that can opine about the appropriate standard of care for a psychiatrist or for Dr. Elison, who was a psychiatrist. They only have experts in other disciplines who didn't review the past mental health records and evidence and didn't have any experience in corrections. To the contrary, defendant psychiatrist expert opines that Dr. Elison provided appropriate gender confirmation assessment and that his continuation of hormones and requests for counseling was appropriate at that time. To the extent there is a disagreement among experts, such a disagreement does not constitute deliberate indifference. This is the Hamby case, for instance. Also, the Kosolik case in the First Circuit, in that case there was a lot of presentation by multiple experts on various sides about whether gender confirmation surgery was medically adequate treatment, and it indicated that a choice of a medical option, even if it's disfavored by some in the field, does not show inattention or callousness to a prisoner's needs rising to a constitutional violation. Now let's look at Dr. Elison's assessment of Ms. Edmo specifically. First of all, Dr. Elison's qualifications were never called into question by the district court. It's also important to keep in mind that this assessment performed by the psychiatrist was a mental health evaluation. He wasn't focused on the physical aspect of it as to whether the surgery was indicated. That would be for a surgeon. He compassionately cared for Ms. Edmo over the years. He's the first person that diagnosed Ms. Edmo with gender dysphoria. Did the presurgical consultation go forward in April? Yes, ma'am, it did. One of the things I'd like to ask you about, your colleague did not address but is addressed in the briefs, has to do with whether this is a preliminary or a permanent injunction. The state related defendants took the position in their briefs that this was a permanent injunction, and then shifted that position after, in their view, any preliminary injunction expired, then stating it's really a preliminary injunction. So do you have a position now as to what your view is? Is this a preliminary injunction or a permanent injunction, or as the district court said, it meets under both standards? This was a preliminary injunction, Your Honor. The motion filed by plaintiffs was a motion for preliminary injunction. It's a mandatory injunction, but it's still preliminary in nature. The court never uses the word permanent in its order for what it ordered. It granted, in part, plaintiff's motion for preliminary injunction. Well, what the court said in its order, in its footnote, is that whether it's preliminary or permanent, that Ms. Edmo was entitled to relief. And so my concern is that in the opening brief, the state defendants argue it's a permanent injunction, but various procedural points were not followed. So my question is this. When the court opens the hearing and says, it's hard for me to envision this hearing being anything but a hearing on a final injunction, at least as to that part of the relief requested, meaning the surgery, I can't find in here anywhere that the state ever stands up and objects to that or addresses that when the court invites again at the end of the hearing to address it in the briefs. So my first question is, when the court said, I think I can't see this as anything but a final injunction, did the state or anybody object to that characterization? Your Honor, it's our understanding, and it was our perspective that the court didn't know, didn't understand, wasn't sure, was questioning whether it's final or not. It was making questions about that at the beginning of the hearing. It was making questions about that at the end of the hearing. But ultimately, it applied the preliminary injunction standard. For instance, if you . . . Well, and then it has . . . I mean, here's the problem I have. As you go through this whole hearing, the judge says, so what is it? This is how I view it. I view it as a final injunction. You don't say anything. And then you get to the end, and the judge says, if you're going to talk about this, you can put it in your briefs. You don't put that in your briefs. If the argument seems to be over, is it mandatory or prohibitive, not to what the judge was asking, is this a preliminary or a final injunction? So you don't object until after the district court is all done and comes up on appeal. Am I wrong about that? Your Honor, I would point you to the Isaacson v. Horn case. I'm asking you first, and then you can talk about the Isaacson. My question is, is there anywhere in there you objected or told the court what your view of the scope of the hearing was? So we weren't afforded the opportunity to object because we didn't get the notice under the Isaacson case. Oh, that is not too persuasive. So in other words, you felt like your lips were zipped when the court says, what is this? Tell me what your view is. Asked you at the beginning of the hearing, then asked you to brief it. I mean, did you ever cite to the judge, well, this is the Isaacson case, and I don't think this is appropriate notice? So, I mean, it seems to me like you're lying in the weeds there. The judge is asking directly, and the State is not objecting. Well, so I should point out. So I guess the question is, was there any objection? I don't believe there's a formal objection, but we never had the opportunity to object because we didn't get notice of clear and unambiguous notice that's required under Isaacson that says, if I could read a quote, Your Honor, if I may, the court cannot convert a preliminary injunction hearing with a trial on the merits unless it provides, quote, clear and unambiguous notice of the intended consolidation before the hearing commences or at a time which will afford the parties a full opportunity to present their respective cases. So there was no notice that this was going to be consolidated, and so we didn't have an opportunity to object before the hearing, and we all proceeded, and even plaintiff's counsel agrees that this wasn't a final trial on the merits. They agreed to that in their brief, and I believe it's on page 60. I've used seven minutes, so I don't know. Well, you told us in your brief that it was a final trial on the merits. You told us in your opening brief. I believe we did not. I think we said to the extent it was treated as a final trial on the merits, that was improper. That's how we couched it. It was a permanent surgery, but we didn't. We said if it was, that's how we couched it, Your Honor. If I may, I'll sit down and reserve the rest of my time. Do my colleagues have any questions? Not right now. Thanks. All right. Good morning, Your Honors. I'm Lori Rifkin, representing appellee Adri Edmo. I'd like to start by going right into Your Honor's questions and the question that the Court issued yesterday for counsel to address. First, I think the Court is exactly right that defendants very clearly took the position in their opening brief on appeal. Throughout their entire brief, they said this was a permanent injunction, it should be reviewed as a permanent injunction, and the Court issued a final trial on the merits. Now, defendants have, mid-appeal, switched their position as an attempt to take a 24-day expiration period for a preliminary injunction under the PLRA, which is not permitted. Defendants can't open their appeal with taking one position, and in their reply, completely switched their position. And it's also wrong that the Court provided no notice that it was thinking about doing so. As Your Honor pointed out, and I believe read from the transcript, Judge Windmill asked counsel about this both at the beginning and the end of the argument. And plaintiffs But I have to say that neither did Ms. Edmo's counsel provide any clarity on this point. Isn't that true? I mean, what's odd to me is the district court is laying out there on two occasions this issue, and it's silence from the lawyers until we get to the appeal. Ms. Edmo's counsel did address it, Your Honor, in the evidentiary record transcript at page 368 to 369. Plaintiff took the position that it was a preliminary injunction addressing really the issue of whether this kind of relief, which is irreversible, can be awarded in a form of preliminary injunctive relief, which seemed to be one of the Court's concerns in response to an argument defendant had actually raised, that this was irreversible relief. So in direct response to the Court's question during the closing argument, I did address that at year 368 and 369. Plaintiff also did argue, again, that it could be awarded as a preliminary injunction on pages 20 to 21 of plaintiff's proposed findings of fact and conclusions of law. Now, the Court provided both rulings. The Court applied the mandatory preliminary injunction standard and in the alternative found that Ms. Edmo had satisfied the standard for permanent injunctive relief. Tell me on that point, because the procedure is irreversible according to the record and you have whatever final relief you would get would actually be afforded in a  case. I mean, it was final and irreversible if your preliminary injunction relief goes forward, correct? That is correct. The surgery would be final and irreversible relief. So it's like if somebody comes in and asks for preliminary injunction, ordering the other party to blow up a building, and on preliminary injunction, they blow up the building. There's nothing left to argue about at that point, right? That's true, Your Honor. But district courts actually are faced with this hard question all the time. For example, in First Amendment cases, it's routine that in the case of a protest of an execution or a presidential appearance, something that's going to occur, say, a week from now, where a party comes in and seeks a preliminary injunction so that they can protest, and the event happens, that's also irreversible. Courts also do this in the context of medical care for prisoners. We cited numerous cases in our brief where district courts around the Ninth Circuit have done this because it's a time-sensitive option, and plaintiffs have to be able to get that relief. But that's why in this circuit, there's a mandatory preliminary injunction standard that is a higher standard than the regular preliminary injunction standard. Why didn't, if really all the relief would be over once a preliminary injunction is granted, why didn't you ask for consolidation of the preliminary with the final injunction? Well, Ms. Admo has a number of other claims as well as damages claims in this case, Your Honor. And also, I think that a plaintiff in Ms. Admo's position should have to meet the preliminary injunction standard. We moved for it without any discovery. We moved for a motion for preliminary injunction at the court's discretion in response to defendant's request. The court permitted discovery and held a lengthy evidentiary hearing here. But we didn't know. There's no guarantee that the district court would handle it that way. And so what we were focused on was meeting the preliminary injunction standard to get Ms. Admo the relief as soon as possible because of the gravity of the harm. And the permanent injunction standard requires a finding on the merits. Plaintiffs ordinarily don't want to forgo a chance to have discovery when you're talking about this kind of importance on the case. So you had four months of discovery here? We had four months of expedited discovery focusing on these specific issues. And it's important to note, again, that the district court did that specifically at the request of defendants. Defendants moved for an extension to respond to the motion for preliminary injunction. They requested six months even to file their response brief. And because the court recognized that this is irreversible relief, the court tried to balance these concerns, and in our view and in defendants' view, in the papers we quoted defense counsel at the hearing, thanking the court for giving them enough time that the full picture could be presented at this hearing. So what do we do now that the 90 days from the hearing expired before this hearing and we now have the defendant's motion that this either should be dismissed or moved? Well, there are two answers to that question. First, the position defendants have taken, and I think that they're stuck with, is that this was a permanent injunction and final relief, so that this 90-day expiration period doesn't apply. They raised that and reversed their position. But the second answer is, if it were a preliminary injunction, once defendants chose to appeal that preliminary injunction order under Griggs, the district court could no longer, no longer had jurisdiction to convert that into a permanent injunction, because while a preliminary injunction's pending, the district court cannot adjudicate the substantial issues being raised in the preliminary injunction. So defendants essentially stopped the clock. And I think that may be the case. Sotomayor, couldn't the district court extend the preliminary injunction? The district court could have renewed the preliminary injunction. But that's not defendants' argument. They didn't argue the district court had to renew the injunction. They argued it, that it expired. And I think Mayweather's is instructive for this, because imagine for a moment that the district court had issued, had renewed a preliminary injunction. Well, then defendants would have said, well, that preliminary injunction isn't before the court. Now we have to appeal that, and we're left kind of in a never-ending cycle where it can't get to appellate resolution before the 90 days is up. And that's what the Mayweather's court recognized. In that case, the district court had issued two injunctions, a first injunction and then renewed it. And by the time the appellate court considered the merits of the appeal, both injunctions had in fact expired. And the appellate court reached the merits anyway. And the district court observed that to do otherwise would essentially be interpreting the PLRA to put, to allow defendants both to appeal and then to take, divest real jurisdiction from the district court. And that would make it impossible, really, for a district court to grant preliminary injunctive relief. The second part is that defendants didn't identify anything further that the district court in this case would have needed to do to finalize its order. The district court made, considered the requirements of the PLRA. We've got its April 9th order, where Judge Winmo was very clear that he had considered all the requirements of the PLRA as reflected in his original order. Defendants have identified nothing that was more required under the terms of the PLRA to finalize this order. Judge Winmo's order was final, and they haven't explained what more he would possibly have to do. So I think either, any way you look at it, there is a live injunction stayed by this court to consider. And under Mischenfelder, which is a Ninth Circuit decision from 1988, this notes that the district court's discretion to consolidate is very broad and will not be overturned on appeal absent a showing of substantial prejudice in the sense that a party was not allowed to present material evidence. And so this court asked, what if this court treated this order as a permanent injunction, as a final trial on the merits? If it did that, the parties would have had to show, any party challenging that would have had to show substantial prejudice in the sense that they were not allowed to present material evidence. And defendants made this argument in their opening brief, but they did not show any substantial prejudice. As plaintiffs pointed out in our answering brief, defendants were permitted to present evidence not only during the live hearing, but in fact Judge Windmill went further and allowed them to present by declaration the testimony of any witness that they had on their list who they didn't get to call. And in fact, they had submitted additional declarations to the court that Judge Windmill also considered. So they have not, and they had ample opportunity to do so, shown any substantial prejudice to them in the event that this court does view this as a consolidated trial on the merits and a permanent injunction. Do you have any other questions on that issue before I turn to the others? Well, I'm still somewhat troubled by the 90-day issue because I thought Mayweather said you either have to convert it or renew it. I don't believe, I believe that Mayweather said that there was no problem under the PLRA with the court issuing a renewed order because defendants in that case had said it was improper. Right. So your position is even though under the terms of the PLRA there's an expiration, that that expiration has somehow stayed? That's correct. Well, there is no definition of what to make something final means in the PLRA, and we looked through the case law nationwide and couldn't find any particular interpretation of what finalized means. And so we look at it as on the one hand, perhaps it means finalize it by converting it to a permanent injunction, in which case the court wouldn't have been able to under Griggs because it cannot convert a preliminary injunction to a permanent injunction while an appeal is pending. Or alternatively, it means something else, but no one has identified what that is, and defendants certainly didn't identify what it is. And Judge Windmill's order was specific. It made the required findings and it told defendants exactly what they had to do and their time period for doing so. So they haven't given any reason why the December 13, 2018, was not a final order if that means something other than converting it to a permanent injunction. So under either interpretation, the 90-day expiration would not apply here. Well, it can't be a complete trial on the merits if you still have outstanding claims, right? Well, it can't be a complete trial on the merits of the other claims, but Plaintiff's motion for preliminary injunction was limited to the injunctive relief, and it was brought under three different legal theories, and the Court denied it, as did the other two. And we've been at this for half an hour, and we're, you know, getting into the details on procedural matters and not really the substance. But what about the fact that some of these state officials in Idaho don't seem to have been operating with any evil intent? I mean, they never tried to wave the flag of, you know, it's going to cost too much and there's going to be an endless stream of these requests, and, you know, we have a strong religious belief against transgender or anything like that. They're — what about the fact that they seem to be officials who are trying to make the best of a very difficult situation? Well, the first response is that three of the officials were sued in their official capacity. So the idea that there somehow had to be a finding of subjective deliberate indifference as to their intent, and the Court was required to make that finding against each individual personally. At this phase, for injunctive relief, that's not accurate. It was injunctive relief when, in fact, there's no damages claims against them in their official capacities, obviously. So we have three of those individuals, the head of the correction system, I think the deputy, and the warden of the prison where she was housed, sued in their official capacity. Right. And they're used to that. They get sued all the time. But this one, you know, has very specific allegations about what they didn't do in I think stings a little bit more. Don't you see that? I do, and I think that it should. In a medical, by Eighth Amendment case, as opposed to a use of force case, there is no requirement that a finding of malicious intent be made. What it is is a purposeful failure to respond to a prisoner's pain or medical need and harm caused by the indifference. And here, it should sting because we represent a woman who has been denied treatment to the point that she tried to cut off her testicles twice. And currently, she takes a razor to her arm and cuts her arm in a desperate attempt not to try to self-castrate again. And what Judge Windmill found after a three-day evidentiary hearing and that with full awareness of Ms. Edmo's circumstances, IDOC and its medical provider, Corizon, refused to provide Ms. Edmo with gender confirmation surgery. They have ignored generally accepted medical standards despite her actual harm. And so I want to be very clear. At the time Ms. Edmo tried to self-castrate, she was receiving hormones and counseling. Defendants have offered her zero additional treatment after either of those attempts. And the Court, despite any protestations about the consideration of an individual psychiatrist or no bad intent, that's not what the standard requires. And I'd also emphasize that that's not this Court's role here. The Court's role is not to reconsider the district court's factual determinations. The district court heard live testimony. It made credibility determinations. It found that Dr. Ellison's testimony, in fact, was not credible and was contradicted by his own records. The district court, after hearing live testimony, found that defendants' experts were not qualified to opine in this area or that they had very little experience. And that went to the weight of their testimony. And he accorded them very little weight. What we have here is not two reasonable alternative courses of treatment. And counsel misstated the standard when he said that the Court was required to find no other reasonable psychiatrist who would act that way. What the Court was required to find under Taguchi is that plaintiff must show this was medically unacceptable under the circumstances and was chosen in conscious disregard of an excessive risk to prisoners' health. And that's what the Court found here. The Court found there's a standard of care. It's accepted internationally. Defendants know what it is. In April 2016, Dr. Ellison did not provide it. He did not use that standard. And since, this is ongoing, that's the standard for a mandatory preliminary injunction or a permanent injunction. This is ongoing harm. It's not like they denied her this once. They continue to deny it to her in the face of her everyday harm. And the finding of bias, defendants can get up here and say that they were well-meaning. But we have here a person whose medical condition is being treated differently. If she were a cancer patient who had a tumor, who had had radiation and had chemotherapy, and that tumor was still growing and threatening her life, the Eighth Amendment, we would all agree, would not permit defendants to deny her surgery even if they professed to be well-meaning about it. But that's what defendants are doing to Ms. Edmo. There is an effective treatment. It's safe. It's established. And they're denying it to her even though the other treatments have not worked, and she continues to be in pain every day. The Eighth Amendment says that prison officials don't get to pick and choose which medical conditions they treat. Now, I think Judge Windmill is an extraordinary trial judge. I'm a district judge. We were chief judges together. I have the utmost respect for him. He did a great job. But this is a complicated issue. I mean, have there been gender change surgeries done on inmates anywhere in the United States, as far as we know? There have, Your Honor. There is one that everyone knows about. Except me. It's in the record. I'm sorry. It's in the record in that it's public knowledge. Shiloh Quine, in the case of California, after Michelle Norsworthy won her case. Oh, yeah, sure. Well, Ms. Norsworthy was released, but Ms. Quine was afforded surgery. And as we told Judge Windmill, though, we didn't have the opportunity to put it in the record yet, CDCR has changed its policy, and it does provide gender confirmation surgeries and has provided them since Ms. Quine. Okay. And in terms of the paroleability and the timing issue, you know that we're not likely to be the final word on this case, and there's a possibility of an en banc or even a cert petition. Is there a certain point where, you know, we're so close to parole, I know 2021, I wasn't sure exactly when the month is, it's better off to just wait and let it happen? To let which happen? The surgery? To have the parole done and then the surgery when she's in the community. Ms. Edmo is not eligible for any early parole because of her disciplinaries, which are many related to her gender. Although they could look at that and say maybe some of those were unfair because she was only being disobedient in a way that we now say is not disobedient. So far they've made no move to do that, but we certainly wouldn't object. No, Your Honors, Ms. Edmo experiences this pain every day, and it's not just she shouldn't have to, frankly, attempt self-castration again or attempt suicide to get the life-saving care. She's troubled every day by severe psychological pain, so each day is a struggle to survive. So the balance of hardship issue is what you're addressing, that it's present now and it's not one that you could delay, so to speak. Yes, both the irreparable harm and the balance of hardships, and defendants didn't challenge the balance of hardships or the public interest. No cost? There's been no allegation that this would cost too much or that it would set a trend. Is that right? And not in their legal filings. That's just atmospheric statements by the defense. Any other questions? Ms. Rifkin, you were here for the first argument. I was. Aren't you glad you don't deal with those issues and you're dealing with these issues? And I commend all the lawyers here for not getting involved in fair credit reporting cases. Thank you, Your Honor. Your Honors, let me address a couple points in reply. First, we need to correct the record that what Dr. Ellison has said is not that she's not going to receive the surgery. They've said not at this time. Right, but the reasons are not going to change. I mean, she's not going to be in a community for six months or so or a year. She's not going to, even if she goes to psychotherapy or group therapy or whatever, that's not going to affect things. So there really is no change in the department's or the doctor's opinion. Right, and I don't want to speak for the doctor, but given the time limitations here, what the record showed was that Dr. Ellison said not at this time, and at that time she was parole eligible. And one thing that he thought would be beneficial is she's never lived full time in the community as a woman, and that was very clear, is she's going to have that opportunity here very soon. Let's not deny that to her because under the WPAT, that's a very big consideration. So she lost her parole ability because of the disciplinary? The declaration of the parole board was that she lost her parole eligibility due to disciplinary reports, primarily her failure and repeated refusal to complete the sex offender treatment programming, which is required due to her offense, which there's a big problem with releasing someone in the community who has not completed that. But the difficulty is that this is her community at this point, and if you were to take an inmate who's never going to be released and make the same argument, well, he or she will never be in the community, it's not very persuasive. So the difficulty we have, I think, is Judge Windmill made fairly clear findings on the importance of the imminency of the surgery, and those findings, of course, we would look at only for clear error. Do you have any specific findings that he made that you view as meeting the clear error standard? As to my clients, absolutely, and I've addressed those. There was zero evidence, and so it was thus illogical and not supported by the record to uphold any finding of reckless disregard against my clients. On this other point of the procedure, can I address that real quick? You may. Your Honor, the defendants filed a joint opening brief, and we never, ever alleged or argued that this was a permanent injunction. We certainly recognized that the relief that was being afforded was permanent. It was final. However, what we were arguing is that this has always been postured as a preliminary injunction. In the opening comments of the hearing, after the hearing had started, Judge Windmill he was confused, admittedly.  This is awkward procedurally, what we're doing here. I don't think he said he was confused. I didn't ever see that. Never admit that. Okay, and I don't want to misrepresent that. You don't want to put words in his mouth. We were certainly confused to some extent as lawyers as to what his comments were getting to. He was approaching whether this is mandatory or preliminary. Our comments in return in the records were that that's how we interpreted his comments. At no point did we interpret that what he was saying was that he was planning or intending to convert this into a final trial in the merits, which we would strongly oppose that. Ms. Edmo, to this day and in her briefing, contends that it was not converted into a final trial in the merits. And we agreed in our briefing that he did not. What we said in our opening brief was to the extent he did, it was reversible error because he did not provide any clear or unambiguous notice to the parties of that intent as required by the U.S. Supreme Court in the Kamenish case as well as in Isaacson. And if he did, that would severely prejudice the defendants because what he's saying is— Well, it is a little bit—I won't repeat myself—it's a little bit of a surprise nobody raised their hand or said to the judge after he kept asking what is the status, and neither the defendants nor the plaintiff really responded to that. So that's why I think he made a determination that I'm going to go under both standards. And I think that his interpretation was a little different than how the parties interpreted it. They just — they didn't see that that's what they were saying. They all agreed that there was a dispute as to the proper standard, whether it was a mandatory or a prohibitory. We were arguing a mandatory. I think that's where the lawyers went wrong, is focusing on — he wasn't asking about that. He said, of course, if it's mandatory, it's a higher standard. And he was very clearly asking about preliminary versus the final permanent injunctive relief. There's no question in reviewing his comments on that. So then we're left with the situation if it's preliminary injunction, what do we do about the 90 days, if anything? Or if we're permanent, we've kind of addressed that with both of you, I think. And if it was a permanent, one last point. Yes. Judge Windmill was in error in citing the standards and saying that there's no difference between a preliminary mandatory injunction and a permanent injunction. As the Supreme Court has said in the Winter case and in citing the Amoco case, that it is very much different. What you have to show on a permanent injunction is you have to show actual success on the merits. Judge Windmill's order never found actual success. Judge Windmill looked at two different standards, whether it was mere likelihood of success and whether there was a clear showing, but he never made it to the actual success. And if this Court finds that Judge Windmill converted it into a final trial on the merits, which we believe will be improper, claims have a much higher burden, and that standard would even be more fatal to Ms. Edmo's claim. Thank you. Thank you. Should we hear from the courts? He tried to reserve some time. You reserved time. Yeah. I know you used it. If you want to say something because we've got time here, then we'll restore your three minutes. How's that? To the point of the prejudice or undue prejudice to defendants, if this were to have been converted into a trial on the merits, defendants were denied a jury trial under the Seventh Amendment. They were, even though there was some discovery allowed, it was limited. Defendants were precluded. There's no due process because we were precluded from conducting additional discovery, presenting additional witnesses at the trial if it were a trial on the merits. We were limited to, I believe it was four hours per side at most, and that included opening and closing and any objections at the hearing. So that wasn't a true trial on the merits, the way it was conducted either. Plaintiff's counsel keeps representing that, and I asked my colleague to make this point, but I wanted to make it too, that Dr. Yoson or the department or whoever denied sex reassignment surgery. He didn't deny it entirely, and the policy allows it. It's an ongoing process. He's monitoring this patient. He was the treating doc, and he had issues with her not complying with her recommended counseling that it was necessary to have her stable and be in a position to cope with this irreversible, life-changing permanent surgery that was being considered. That's medical judgment in and of itself. That's the heart of medical judgment. The treating doc needs to be able to make those decisions. And should look at it on a revised basis too, right, just not freeze it in one point in time. I mean, this woman is suffering, and maybe the doctor should go back and say, okay, I have new information. I have new data about the situation. I shouldn't be frozen in what I said X number of years ago. Would you agree with that? I would agree with that, and they're doing that. They're continuing to monitor Ms. Edmo and recommending counseling. And as of when our experts and, more importantly, the treating clinicians were seeing her and submitted declarations right before the hearing, they still had the same issues with Ms. Edmo not cooperating and the underlying mental health issues, which were very significant. Yeah, I mean, look at her whole history. She's had a tough life. She grew up on very difficult circumstances in the reservation. Her criminal history speaks for itself. Her suicide attempts preceded any of this. But also, you know, let's not get so frozen in time that, boy, if she doesn't do this, she's not going to get that. She's going to have her gender confirmation surgery sooner or later, and unless in the interim she gets so despondent that she hurts herself to a degree that nobody in here wants her to. So, I mean, I'm a district judge. I'm always looking for a resolution of a case rather than just to litigate forever. I wonder if the parties on the defendant's side might take a look at this and say, well, you know, maybe we should reassess this or maybe she should be paroled and let her do what she needs to do. That's all I'm saying. The other thing I would ask you is, has this case been through the Ninth Circuit mediation process? No, Your Honor. It has not. Okay. Again, there's always concern, I'm sure, in the prisons about dispositive rulings that might implicate them or have downflow. But, you know, individual cases offer the opportunity for individual discussion. So we may consider, and you might think about, whether this is the kind of case that may be appropriate for mediation. Thank you. Thank you. I would like to thank. I very much appreciate the Court's time. Sure. And I want to really thank both parties for the briefing. It's very extensive, and I think that both your argument and the briefing show that you're well familiar with the issues. You've been at this a while with each other, and certainly with Judge Windmill, who's made very, very detailed findings that we have to review here. So, well, of course, as you know, we don't make any rulings from the bench. It's not the district court. It's something that, you know, requires considerable study on our part. And as you well know from Ninth Circuit procedure, we had these briefs long before you knew that you were coming here. So we've had a fair amount of time to study these, but we may require more. So thank you all for your argument this morning. The case just argued of Edmo versus Idaho is submitted, and we're adjourned for the morning. Thanks. All rise.
judges: McKeown, Gould, Lasnik